Machell Phibbs
520 South 175 East
Ivins, Utah 84738
Ph. No. 435 628-8626

FILED
CLERK, U.S. DISTRICT COURT

-5 APR 02 PM 3: 43

DISTRICT OF UTAH

RECEIVED CLERK
MAR 29 2002
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION
BY CHRISTAN CLERK

| | | |
|---|---|---|
| Machell Phibbs And Machell Phibbs In Behalf Of Her Minor Daughter, And As Best Friend Of Nicolina Phibbs, Plaintiffs. | : | |
| | : | Diversity Of Citizenship/ Civil Rights Complaint |
| vs. | : | |
| American Property Management; Paul Tatum, Agent American Property Management; Melissa Schimbeck, In Both Her Capacity As Assistant Manager And Manager Of Canyon Place/ Rock Creek Apartment Complex; Jamie Dalton, Assistant Manager Of Canyon Place/Rock Creek Apartment Complex; David Gibson, Police Officer, St George, Utah Police Department; Nellie Nobles, Tenant Canyon Place/ Rock Creek Apartment Complex; Samual Nobles, Tenant Canyon Place/ Rock Creek Apartment Complex; John And Jane Doe One Through Thirteen, Defendants. With The Exception Of Nellie And Samual Nobles, Who Are Sued In Their Personal Capacities. All Other Defendants Are Sued In Both Their Personal and Professional Capacities. | : | 28 USC § 1332 |
| | : | 28 USC § 1331 |
| | : | 28 USC § 1334(1)(2)(3)(4) |
| | : | 42 USC § 1983 |
| | : | 42 USC § 1985(3) |
| | : | |
| | : | Civil No. |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | Verified Complaint And Jury Demand. |
| | : | 2:02CV-0260S |
| | : | 2:02CV=0260S |

-----------------------------------------------------------

**A.**                    **JURISDICTION**

The jurisdiction of this Court to entertain The Cause is

conveyed pursuant to Article III § 2 of the United States

Constitution which extends the jurisdiction to cases arising under

the United States Constitution; and pursuant to 28  USC  1332

*3*

diversity of citizenship because the amount in controversy exceeds $75,000.00 exclusive of interest and costs; and 28 USC § 1331, federal question; and 28 USC § 1334 (1)(2)(3) (4), civil rights; and 42 USC § 1983, civil rights; and 42 USC § 1985 (3), conspiracy to violate civil rights; and State law claims under USC 28 § 1367.

**B.**                                    **VENUE**

    Venue is proper in this Court in that Defendant American Property Management is a Washington State based corporation doing business as Canyon Place/Rock Creek Apartments locate at 1503 N. 1200 W. in St. George, Utah 84770; and the totality of events giving rise to Plaintiffs' claims occurred within the premises known as Canyon Place/Rock Creek Apartments and environs of and in St. George, Utah; and, because this civil Action is not founded solely on diversity of citizenship venue is proper under 28 USC § 1391(b)(1) and (2).

### PARTIES TO THE COMPLAINT

    1.  Plaintiff Machell Phibbs is a resident of Washington County, City of Ivins, State of Utah; and during the times, and places, and acts complained about was a resident of, and domiciled with her minor daughter, Plaintiff Nicolina Phibbs, in apartment Nos. A-105 and F-203 at the Canyon Place/Rock Creek Apartments located at 1503 N. 2100 W. St. George, Utah 84770.

    2.  Plaintiff Nicolina Phibbs is the minor  daughter of Plaintiff Machell Phibbs and during the times, and places, and acts

-2-

complained about was domiciled with her mother in apartments
Nos. A-105 and F-203 at Canyon Place/Rock Creek Apartments
located at 1503 N. 2100 W. St. George, utah 84770.  Plaintiff
Nicolina  Phibbs is domiciled with her mother, Plaintiff, Machell
Phibbs, in Ivins, Utah.

## DEFENDANTS

3.  Defendant American Property Management is a corporation
located at 600 108th Avenue N.E. Suite 600 Belleue, Washington
98004, doing business in the State of Utah in Washington County,
City of St George as Canyon Place/Rock Creek Apartments located
at 1503 N.  2100 W. St. George, Utah 84770.

4.  Defendant Paul Tatum, an Agent for American Property
Management, business address is at 600 108th Avenue N.E. Suite
600 Belleue, Washington 98004.

5.  Defendant Melissa Schimbeck during the times, places and
acts complained about herein was an employee of American Property
Management in the capacity of both Assistant Manager then upon
the firing of Ms. Martin, Melissa Schimbeck became the Manager of
Canyon Place/Rock Creek Apartments located at 1503 N. 2100 W. St.
George, Utah 84770.

6.  Defendant Jamie Dalton during the times, and places, and
acts complained about herein was an employee of American Property Management
in the capacity of Assistant Manager of Canyon Place/Rock Creek
Apartments located at 1503 N. 2100 W. St. George, Utah 84770.

7.  Defendant David Gibson during the times, and places, and
acts complained about herein was employed  by the St. George

Police Department in the capacity of a police officer.

8.   Defendant Nellie Nobles during the times, and places, and acts complained about herein was a  tenant,  domiciled with her husband defendant Samual Nobles, in the apartment directly under Plaintiffs' apartment at the  Canyon Place/Rock Creek Apartments located at 1503 N. 2100 W. St. George, Utah 84770

9.   Samual Nobles during the times, and places, and acts complained about was a tenant domiciled with his wife, defendant Nellie Nobles, at 'Canyon Place/Rock Creek   Apartments located at 1503 N. 2100 W. St. George, Utah 84770

10. Defendants with the exception of American Property Management, a corporation based in Washington State doing business in St. George  Utah as Canyon Place/Rock Creek Apartments located at 1502 N. 2100 W. St. George, Utah 84770, and Paul Tatum whoes residence is not know, bub who works at American Property Management's headquarters at 600 108th Avenue N.E. Suite 600 Belleue, Washington 98004; to the best of Palintiffs' knowledge and information reside either at Rock Creek Canyon Place Apartments or in the environs of St. George, Utah. And to the best of Plaintiff's current knowledge and information at this time reside within  the district of Utah, State of Utah and within the venue and jurisdiction of this Court.

D.                     **NATURE OF THE CASE**

This is a Civil Rights Complaint for damages alleging the violation of and invidious conspiracy to violate by the Defendants rights, privileges and immunities afforded to Plaintiff Machell Phibbs, a handicapped person within the meaning of the ADA and the.

−4−

FHA Acts, and her minor daughter, Plaintiff Nicolina Phibbs
protected under various Federal and State of Utah statutes, and
the Fourth, Fifth, and Fourteenth Amendments to the Untied States
Constitution, and Article 1, Sections 7, 24, and 25 of the Utah
Constitution, that arose out of the intended, and purposeful and
discriminatory acts and inactions both individual and combined
by the defendants, that deprived Plaintiff Machell Phibbs and her
minor daughter of these right, privileges, and immunities
secured to them under the Federal and State of Utah statutes and
Constitutions.

E.                            **PROCEDURAL HISTORY**

   Administrative Remedies:  Plaintiff Machell Phibbs on or
about October 25, 1999 submitted a noterized complaint with the
Utah Antidiscrimination and Labor Division (UFHA No. 00-H-0006;
HUD No. N-12-0034-8) in Salt Lake City, Utah in which the acts
and inactions underlying this Civil Rights complaint were
presented.  Subsequently, and in response to defendants'
American Property Management, Paul Tatum, and Melissa Schimbeck
response, Plaintiff Machell Phibbs on January 12, 2000 submitted
her Reply, and on April 24, 2000 the matter was dismissed as
untimely.  Ms. Phibbs submitted a motion for reconsideration
on June 9, 2000 that was denied on April 17, 2000.

F.                         **STATEMENT OF THE CASE**

1.  During all the times and events that gave rise to this cause
of Action, Plaintiff Machell Phibbs ("Ms. Phibbs") and her minor
daughter were tenants domiciled in apartment A-105 and later

-5-

in apartment F-203 from May 1998 to August 14, 1999 the day the
assault occurred though Ms. Phibbs and her minor daughter did not
move until on or about mid October of 1999 they did not reside in
apartment F-203 for fear of their lives, at Canyon Place/Rock
Creek Apartments located at 1503 N. 2100 W. St. George, Utah
84770.

2.    On or about April 1998 in seeking to move to St. George, Utah;
Ms. Phibbs initiated her first contact with the St. George Housing
Authority from Tooele, Utah her former place of residence, when
she called in regards to the availability in St. George, Utah of
suitable affordable housing for her and her minor daughter.  They
recommended Canyon Place/Rock Creek Apartments.  It was at this
time that Ms. Phibbs placed a deposit on an apartment.

3.    Later in May Ms. Phibbs and her  minor daughter drove down
to St. George and viewed through appointment with Assistant
Manager, Defendant Melissa Schimbeck ("Schimbeck") apartment A-105
at the Canyon Place/Rock Creek Apartment Complex.

4.    And  then   Ms. Phibbs signed the lease/rental agreement
and informed Schimbeck she was handicapped.


5.    When Ms. Phibbs inqured about her parking; Schimbeck
indicated a slot that was occupied by a red/orange Jaguar plate
No. 541KNG; and at Ms. Phibbs' comment; Schimbeck told Ms. Phibbs
to park  illegally.

6.    Ms. Phibbs protested this pointing out the brochure
advertised handicapped parking.

7.    Through out the months of June and July Ms. Phibbs experienced continual problems with accessing her parking slot; other tenants or their visitors were using her slot, or their vehicles were blocking in her car or denying her access to her parking.

8.    This initiated a series of verbal telephonic, and later written complaints by Ms. Phibbs to the apartment complex's management protesting, and asking management to correct this problem.

9.    In turn Ms. Phibbs was specifically instructed by Schimbeck, then Assistant Manager, to go door to door and identify who was parking in her slot.

10.   And then to take down license plate numbers; and then to take pictures because Schimbeck declared she needed evidence to substantiate the complaints that Ms. Phibbs was being denied use of her assigned parking slot.

11.   An example of a particular nasty but typical incident that arose as a result of going door to door following Schimbecks' instructions occurred on or about July 4, 1998.

12.   At that time a friend of Ms. Phibbs came to visit with her and her minor daughter.

13.   Ms. Phibbs' minor daughter and her friend Sherrie's minor daughter were cousins.

14.   And in response to a vehicle parked in her slot Ms. Phibbs called the apartment complex management and complained that a

party's vehicle was parked in her slot.

15.  Ms. Phibbs was told to go door to door and find out whoes vehicle was parked in her assigned slot.

16.  Ms. Phibbs, and her friend and their minor daughters went door to door as instructed by Schimbeck, and when this man was asked to move his vehicle he became belligerent and aggressive and talked abusively, using foul language to Ms. Phibbs and her friend and their minor daughters.

17.  Ms. Phibbs in turn reported this incident to management, but management took no action to warn or prevent tenants or their visitors from using Ms. Phibbs parking slot, or to desist in their threatening comments and use of foul language to Ms. Phibbs and her minor daughter.

18.  From the time Ms. Phibbs moved to the Canyon Place/Rock Creek Apartments she was consistently denied use of her parking.

19.  Ms. Phibbs continued to call the complex management on the average of once a week concerning her parking, and because the office was not too far distance from her apartment she asked that someone walk the short distance and see for them selves that a vehicle was parked in her slot, but Schimbeck would not comply.

20.  This tipified what Ms. Phibbs and her minor daughter experienced, and in having a car towed they were harassed by this party, after management gave their apt. No. to this party.

21.  With the exception that the move to apartment F-203, and the ensuing parking problem in conjunction with Schimbeck's instructing Ms. Phibbs to take down license plate numbers of the vehicles parked in her slot or take pictures precipitated and set up

-8-

Ms. Phibbs and her minor daughter being assaulted by N. Nobles

22.  Ms. Phibbs provided Schimbeck and Assistant Manager Dalton ("Dalton") at management's request license plate numbers, e.g. 650 KCN; Margos 695ZE; 541 KNG; 452JMY; 902JCZ; KY?895; & 243ZUL.

23.  These numbers represented but a few of the vehicles that more or less used Ms. Phibbs parking slot at their will; this was not simply a one time thing with these vehicles.

24.  The vehicle owners when asked to move their vehicles by Ms. Phibbs and/or her minor daughter so they could either access and use their car, or in turn park were most of the time verbally abused and threatened with being assaulted by these persons.

25.  Ms. Phibbs in further compliance with management's request provided, in addition, to license plate numbers; photos of some of the vehicles utilizing her parking slot.

26.  In the latter part of August 1998 Ms. Phibbs notified management in writing of the problems she was having not only with her parking; but, and because those tenants whose visitors were parking in her slot were now continually verbally harassing her and her minor daughter; and making threats against their lives; she was looking for another place to live.

27.  On into September of 1998 Ms. Phibbs looked for something affordable; but she was unable to find a place that would accomodate her and her minor daughter.

28.  Through September, October, and November the verbal abuse and threats against their lives intensified with Ms. Phibbs registering complaints with management.

29.  From threats and verbal harassment matters escalated to

overt aggression when tenants in A-206 who lived above Ms. Phibbs
and her minor daughter started throwing lite cigaretts, and
matches, and garbage, and spit down on Ms. Phibbs and her minor
daughter, or on occasion they would vomit over the railing down
in front of their apartment door.

30.  And at other times this particular tenant and their visitors
would pull up right in front of Ms. Phibbs' and her minor
daughter's bedroom windows during the late night or early morning
hours and turn up full blast their cars' music system and scream
obscenities at them.

31.  All these incidents were reported to management, but no
steps were taken to defuse the situation by management; instead
Schimbick's standard rejoinder was it's apartment living; nothing
she can do.

32.  Subsequently, in turning up the harassment on Ms. Phibbs and
minor daughter; the tenants in A-206 the McMurrays, on or about
November 11, 1998 in retaliation for her notifying management
concerning their visitors parking their vehicles in Ms. Phibbs'
parking slot stationed their Pit Bull in the stair well directly
in front of Ms. Phibbs and her minor daughter's apartment denying
egress from their apartment.

33.  Ms. Phibbs called management and Schimbeck told Ms. Phibbs to
again take pictures this time of the dog blocking her exiting her
apartment that with out proof she could do nothing.

34.  In attempting to take a picture of tenants in apartment A-206
Pit Bull; Ms. Phibbs was accosted by Mrs. McMurray who with her

husband owned the Pit Bull; she with her hand blocked the lens of Ms. Phibbs camera preventing Ms. Phibbs from taking pictures, or closing her apartment door.

35. This occurred in the door way of Ms. Phibbs apartment, A-105, from where she was attempting to take a picture of the Pit Bull blocking her leaving her apartment.

36. Ms. Phibbs was just inside her door way attempting to take a picture of the Pit Bull, when a neighbor and friend of Mrs. McMurrary yelled out she has a camera; she is trying to take a pictures.

37. At this time Mrs. McMurray came from by the stair well and blocked with her hand Mrs. Phibbs camera.

38. Ms. Phibbs attempted  to close her door, but Mrs. McMurrary's foot blocked the door

39. And Mrs. McMurray  yells out; she's hitting me; and her husband swings down from above and starts yelling and screaming at Ms. Phibbs.

40. Ms. Phibbs gets her apartment door closed and Mr. McMurray starts banging on the door threatening to beat the "fuck" out of her.

41. Ms. Phibbs calls the police.

42. On November 15, 1998 after paying that months rent on A-105; Ms. Phibbs and her minor daughter moved to apartment F-203 where she had to pay additional monies  for utilites, cable T.V.; turn off and on the phone, and she was denied the use of her parking.

43. According to then apartment manager, Ms. Martin, she could not authorize Ms. Phibbs to move from apartment A-105 to

-11-

apartment F-203 without express approval from American Property Management.

44.   At this juncture a Paul Tatum, who to the best of Ms. Phibbs information was an agent for American Property Management in Washington State; and he was at the apartment complex to determine the reasons for so many vacancies at the complex.

45.   Ms. Phibbs in realizing the need to move over the violent confrontation with the McMurrays in retaliation for her contacting apartment complex management over their visitors continual use of her parking slot sought out Ms. Martin.

46.   But, as Ms. Martin explained to Ms. Phibbs; she could not authorize the move; and she discussed the matter with Mr. Tatum who initially objected to the move, then approved the move once Ms. Martin briefed him regarding Ms. Phibbs being handicapped and that the problem arose from notifying management concerning the McMurray's visitors continual use of her parking slot.

47.   Additionally, Ms. Martin had relayed to Ms. Phibbs that she was trying to pursuade American Property Management to allow denoted handicapped parking and posting notice that violators would be towed.

48.   Ms. Phibbs had two cars towed that used her parking; one on 8-17-1998, then she was informed by the tow company that they could not tow cars from the apartment complex with out the express request from management.

49.   With the move to apartment F-203 an up stairs apartment, the situation did not change; Ms. Phibbs experienced the same problems with her parking only worse.

50. Almost simultaneous with Ms. Phibbs and her minor daughter's move to apartment F-203 defendant Nellie Nobles ("N. Nobles") moved into the apartment directly below Ms. Phibbs.

51. N. Nobles and her visitors more-or-less took over Ms. Phibbs parking.

52. Ms. Phibbs complained to the apartment management asking that they do something about the problem, but Schembick, now the manager; and Dalton now assistant manager would only assert it's apartment living; there is nothing I can do; I am only the manager.

53. Ms. Martin in giving to Ms. Phibbs a written statement wrote that she was fired because she interceded for Ms. Phibbs with the move to apartment F-203; and for trying to get something done about getting in denoted handicapped parking for the handicapped tenants.

54. Schimbeck again had Ms. Phibbs going door to door to find the parking violators, take down license plate numbers, and taking pictures.

55. Subsequently, over the next few months N. Nobles continued her threats against/harassment of Ms. Phibbs and her minor daughter; this harassment and hostility initially arose from Ms. Phibbs and her minor daughter complaining to management about Nobles visitors' constantly using her parking; preventing their use of it.

56. Schimbeck was made aware of the constant harassment and threats by the Nobles to get Ms. Phibbs and her minor daughter, through phone calls, letters, and by Ms. Phibbs going to the office to register her complaints.

-13-

57.   The abusive language used by the Nobles toward

Ms. Phibbs and her minor daughter reached such a level that N.

Nobles and at times S.Nobles  would follow Ms. Phibbs or her

minor daughter when either  or both would walk her minor

daughter's dog and yell and scream, threats and verbal abuse;

Ms. Phibbs reported all such incidents to Schimbeck or Dalton

with the same response, that it was apartment living; nothing

she can do; I'm just the manager; this represented Schimbecks'

standard claim; with Dalton following suit; nothing we can do.

58.   Sometime in March Ms. Phibbs minor daughter's hair began

falling out; Ms.Phibbs developed a sleep disorder that was

being treated by a doctor; and both Ms. Phibbs and her minor

daughter began seeing a psychologist; and Ms. Phibbs notified

management of these developments and requested suitable

accommodations.

59.   On or about March 23, 1999 Ms. Phibbs called the police

N. Nobles was  verbally  harassing  her  and her  minor

daughter------------------------------Ms. Phibbs had also complained

to Schimbeck who again said their is nothing she can do; it is

apartment living; she is just the manager.

60.   Sometime around the first part of April it was pointed out

to Ms. Phibbs that "fuck Machell" had been carved into the

stairs in plain view of all who passed by; Ms. Phibbs complained

to Schimbeck [on several occassions], and asked that it be

removed, but as of the time Ms. Phibbs and her minor daughter

moved some six months later it was still there.

61.  On or about April 21, 1999 food is thrown all over Ms. Phibbs apartment door (F-203) and a neighbors (F-204) and the stair case leading to her apartment; she complained to management; no response.

62.  Ms. Phibbs and a neighbor who is fully cognizant of these events herein set forth, and, who, along with other tenants have given Ms. Phibbs written statements started cleaning up the strewn about food.

63.  Upon finishing Ms. Phibbs and tenant in F-204 then went for a walk and on return from the walk N. Nobles confronts Ms. Phibbs and her neighbor with a hammer she is carrying screaming accusations and making  threatening gestures with the hammer toward Ms. Phibbs.

64.  Ms. Phibbs calls the police;  Ms. Phibbs and her neighbor are interviewed by Gibson;  Gibson also was the officer who responded to Ms. Phibbs and her minor daughter being assaulted; it was at this incident where Gibson told Ms. Phibbs he was not the baby sitter and not to be calling the police; the next time time she called the police she was going to jail.

65.  Gibson at the food throwing and hammer incident  scolded Ms. Phibbs and her neighbor   for   calling the police; telling Ms. Phibbs the next time she called the police he was taking her to jail; saying he is not the baby sitter; she was going to have handle these problems her self.

66.  On several different occasions during March, April,  and May the Nobles banged and scratched Ms. Phibbs car; Ms Phibbs

on one occasion notified the police after   she   notices
a deep scratch down the side of her car; Ms. Phibbs complained
to management, but Schimbeck would only comment it was
apartment living; nothing she could do; she was only the manager.

67.   During various times in June 1999, N. Nobles husband S.
Nobles would follow Ms. Phibbs minor daughter while she walked
her dog.

68.   At other times he would sneak up behind Ms. Phibbs and her
minor daughter when they both would walk the dog because of
S. Nobles stalking of Ms. Phibbs minor daughter, and loudly yell
and scream at Ms. Phibbs, or sit on the steps denying access to the apt.

69.   At the time these incidents occurred as set forth at
paragraphs 67 and 68 and as concerns all incidents herein set
out; Ms. Phibbs complained to management; either Schimbeck or
Dalton or  unknown  office  worker;      Schimbeck or Dalton
would again state that their was nothing she could do; it was
apartment living and with Schimbeck, she was just the manager.

70.   Toward the end of June or the early part of July 1999 Ms.
Phibbs initiated contact with St. George Housing Authority to
determine what steps were necessary to move.

71.   Ms. Phibbs again started looking for affordable housing
that would accommodate her and her minor daughter.

72.   On or around July 4, 1999 the Noble set off fire works in
Ms. Phibbs parking slot; and management blamed Ms. Phibbs
leaving a notice she was in violation of the rental agreement.

73.   On or about July 12, 1999 Ms. Phibbs undergoes an
operation to remove an ovarian cyst and tumor.

74.  On or about July 17, 1999 Ms. Phibbs former husband comes to visit their minor daughter, and her minor daughter witnesses N. Nobles scratch a line down his truck.

75.  On or about August 5, 1999 Ms. Phibbs again notifies in writing St. George Housing concerning what steps to take inorder that her and her minor daughter  could move.

76.  Sometime toward the end of July or in early August Ms. Phibbs phone starts acting as a party line with the Nobles on it.

77.  Ms. Phibbs contacts U.S. West who send out a repairman; the repairman states it is an internal problem, that the wiring in the building is causing the problem.

78.  Ms. Phibbs contacts management, and Schimbeck has a maintenance man, James, check the phone lines.

79.  The maintenance man declares their is nothing wrong with the wiring and Schimbeck again takes  a hands off stance, though the Nobles were making calls utilizing the apartment complex's wiring to splice into Ms. Phibbs phone.

80.  U.S. West billed Ms. Phibbs $90.00 for the service call.

81.  On or about August 12, 1999 Ms. Phibbs contacts Schimbeck, and ask for the number of someone who can do something about what is going on, because Schimbeck is just the manager and cannot do anything; Schimbeck provides Ms. Phibbs with the phone number of some one at American Properties Management named Annie.

82.  On or about  August 13, 1999 Ms. Phibbs is bleeding out the incision from the operation (¶ 73) that removed an overy and cyst and sees her doctor.

83. On or about August 14, 1999 around 10:00 a.m. Ms. Phibbs pulls hen car out of her garage and into her parking place, and she opens the door for her minor daughter who has brought down a load of laundry; they are preparing to go do the laundry.

84. Hooked to an expandable leash from the Nobles' door is a dog that starts barking, and Ms. Phibbs says bark bark Shadow to the dog; N. Nobles steps out of the door to her apartment saying dogs name is not Shadow as Ms. Phibbs starts up the stairs her minor daughter starts down the stairs with another load of laundry.

85. N. Nobles then accuses Ms. Phibbs of throwing garbage down on her patio; Ms. Phibbs denies this; and N. Nobles goes off saying that every body hates you (Ms. Phibbs) and that Melissa wants you (Ms. Phibbs) out of here.

86. Ms. Phibbs points to the stair case where "fuck Michell" was carved in and says I know how you feel.

87. At this time N. Nobles says Ms. Phibbs minor daughter dresses like a whore, and Ms. Phibbs says you ought to know, and N. Nobles walks up and flips a cigarette at Ms. Phibbs and it hits her in the face causing a burn that has scared; then N. Nobles slaps Ms. Phibbs and starts hitting her in the head with a black looking object she had in her hand.

88. As N. Nobles was beating Ms. Phibbs her husband, S. Nobles was behind her yelling encouragement; saying how do you like that, etc.; at this point N. Nobles starts kicking Ms. Phibbs in the stomac where the incision was; yelling at her Melissa wants you out of here.

-18-

89.   Ms. Phibbs minor daughter yells at N. Nobles quite beating my mother, and steps in between her mother and N. Nobles.

90.   N. Nobles then starts beating on Ms. Phibbs minor daughter; slapping and kicking her, and punching her with the black object she held in her hand.

91.   Ms. Phibbs starts screaming at N. Nobles quite hitting my daughter.

92.   N. Nobles let go of Ms. Phibbs minor daughter after the tenants in F-204 come out, Ms. Krammer and her fiancee.

93.   Ms. Phibbs minor daughter was trying to pick up her mother and carry her up stairs, but Ms. Phibbs told her instead to go call the police.

94.   In the meantime S. Nobles was telling N. Nobles to pick up the cigarette butt; get the black object she had used to beat Ms. Phibbs and her minor daughter with.

95.   As Ms. Phibbs has set out at ¶ 62 the acts and events complained about herein have been substantiated  through not only Ms. Phibbs own written record of these events, and copies of letters, and in some instances pictures; but, also the written statements of other tenants who shared similar experiences with the Nobles and parking and the do nothing attitude of management at Canyon Place/Rock Creek apartment complex and American Property Management (parking refers to handicap parking).

96   And in regards to the assault set forth ante on  Ms. Phibbs and her minor daughter and the statements regarding the events and acts subsequent to the assault; have all been substantiated through Ms. Phibbs own written recording; the statements of

-19-

other tenants; hospital records; police records; telephone
records; photographs; letters; bills and a state court
finding against N. Nobles for disorderly conduct; and a
restraining order to prohibit N. Nobles from contacting Ms.
Phibbs.

97.  With the call to the St. George Police Department, Gibson
responded; the same police officer who responded to the events
set forth at ¶ 64    and who interviewed Ms. Phibbs and the
tenant, Ms. Krammer, who lived in F-204, the apartment next to
Ms. Phibbs; who, also, had food thrown on her apartment door;
and the same officer who told Ms. Phibbs that the next time she
called the police he was taking her to jail.

98.  As Ms. Phibbs minor daughter went up the stairs to call the
police; Ms. Phibbs asked Ms. Krammer and her fiancee to stay with
her so that N. Nobles would not beat her some more.

99.  During this period, before the police arrived the Nobles
hurriedly gathered up the black object N. Nobles used in
assualting both Ms. Phibbs and her minor daughter, and the
cigarette butt N. Nobles flipped in Ms. Phibbs face.

100. At this time N. Nobles was yelling at Ms. Phibbs cry baby
cry baby.

101. With the arrival of police officer Gibson, he confronts Ms.
Phibbs' minor daughter and tells her she is under arrest for
assault, and you are going to jail; and he starts writing her a
ticket, Ms. Phibbs' minor daughter told Gibson; you mean juvenile
detention don't you; so Gibson starts writting out another ticket.

102.   And Gibson claimed without interviewing anyone that Ms.
Phibbs started the fight with N. Nobles; and she was going to
jail.

103.   Gibson does not interview S. Nobles or N. Nobles; he tells
Ms. Phibbs; didn't I tell you the last time I was here that if
you called us again you were going to jail; and with this
statement he called for a female officer.


104.   Ms. Phibbs' minor daughter kept asking Gibson to let her
call an ambulance, that he mother was hurt, that she had just
been operated on and N. Nobles had been hitting and kicking her
mother in the stomac.

105.   Officer Gibson refused stating they were both going to jail.

106.   Ms. Phibbs' minor daughter continued insisting that he let
her call an ambulance, but Gibson refused; he would not allow
either Ms. Phibbs or her minor daughter to move from where they
were.

107.   Gibson had let the Nobles go back into their apartment,
and ordered Ms. Krammer and her fiancee into their apartment,
after asking them if they witnessed Ms. Phibbs and her daughter
hitting  N. Nobles; and when they said no they did not witness
Ms. Phibbs and her minor daughter assualting N. Nobles; and he
would not let them tell what they had witnessed.

108.   Gibson in changing his mind told Ms. Phibbs' minor daughter
that if she would now write out a statement he would call an
ambulance for her mother; she complied; and Gibson called an
ambulance.

-21-

109.  Ms. Phibbs and her minor daughter were both taken to the emergency enterance to the St. George hospital.

110.  At the hospital Ms. Phibbs with the I.V. in her arm was placed in bed,   and in inquiring about her daughter she was informed that she had to sign forms so that they could treat her minor daughter.

111.  Gibson immediately interceded and said no, she can not sign the forms for the treatment of her daughter until she signs the tickets he had; Ms. Phibbs signed the tickets without being able to read them; then the forms so her daughter could be treated.

112.  At this point emergency room staff were asking Ms. Phibbs about the incident and when Ms. Phibbs attempted to explain what happened  Gibson would interrupt her and say she started a fight; she and her daughter jumped on N. Nobles and got the worst of it.

113.  Ms. Phibbs and her minor daughter after being treated and released from the hospital returned to their apartment in the late afternoon, where the Nobles began screaming at them; making threats;     and    banging on the walls and  howling, saying Melissa wants you out of here.

114.  Ms. Phibbs calls management about the assault; and the harassment; and the office informs Ms. Phibbs, Melissa is out; she will not be back till Monday; and their is nothing they can do.

115.  Ms. Phibbs calls the domestic violence shelter and the

police.

116.   In calling the police Ms. Phibbs ask for a copy of the
ticket; and her sun glasses that Gibson had taken.


117.   Gibson arrives at Ms. Phibbs apartment and gives her a
copy of the tickets; he is wearing Ms. Phibbs sun glasses;
and ask her if she is having a good day.

118.   At the time of their return from the hospital their
apartment door is  unlocked  her car door is   unlocked and
their laundry is strung out; some in the car;
and in the apartment.

119.   Their apartment had been gone threw; perscription
medication was spilled out of bottles and left about.

120.   Upon their return from the hospital to their apartment,
Ms. Krammer comes over and informs Ms. Phibbs that N. Nobles
had purposefully punched and kicked her in the stomac because
she knew Ms. Phibbs had recently been operated on, and punched
her minor daughter in the mouth because she knew she had braces.

121.   Ms. Krammer helped Ms. Phibbs and her minor daughter
gather up their laundry and prepare to leave their apartment;
they can not with the yelling and screaming and threats from
the Nobles and the lack of help from management or the police
stay in their apartment; Ms. Phibbs is in fear that her and her
minor daughter will be assaulted again or killed and she knew
that Gibson or the St George Police would not provide her any
help; they leave their apartment with Ms. Krammer's assisting so
that they will not be assaulted again by Nobles.

122.  The following day, August 15, 1999, Ms. Phibbs and her minor daughter return to the apartment to get her daughter's school class schedule, pencils, notebook, and some clothes; Ms. Phibbs  is  unable to climb the stairs due to the swelling in the area of the operation; and her minor daughter goes up to the apartment and Ms. Phibbs takes a picture of the stairwell.

123.  In the process of Ms. Phibbs' minor daughter taking additional pictures; S. Nobles drives up and jumps out of the vehicle he is driving and starts screaming and yelling at Ms. Phibbs minor daughter, I'm going to kill you; take all the pictures you want;   . . she  runs  and jumps in the car and they take off;  S. Nobles runs and gets in his car and chases after them; Ms. Phibbs heads to the St George Police Department; and when they enter the parking area of the police station; S. Nobles desists in his pursuing them.

124.  Ms. Phibbs informs the police officer at the desk that a man is following them who is threatening to kill them; Ms. Phibbs explains the occurance.

125.  Though Ms. Phibbs  ask the desk officer not to call Gibson; he none-the-less called Gibson; explaining that Gibson was handling the case.

126.  Gibson shows up and tells Ms. Phibbs haven't you had

enough; you want some more; you want to keep this up; even
after Ms. Phibbs explained the conduct of S. Nobles; Gibson
was indifferent to her complaint.

127.  Gibson has Ms. Phibbs write out a statement; then he
harasses her saying aren't you done, yet; what are you doing
writing a book.

128.  Gibson fills out a complaint and wrote in S.  Nobles
says he is going to kill you because of the pain and suffering
you have caused his family.

129.  Ms. Phibbs informs Gibson that is not correct; Gibson
in turn informs Ms. Phibbs their is nothing he can do unless
she signs the complaint; he is not going to change it.

130.  Gibbson then refuse to give Ms. Phibbs a copy of the
complaint.

131.  Gibson also stated that because the witnesses to the
threat to kill were minors they could not testify against S.
Nobles.

132  On or about September 1, 1999 Ms. Phibbs, though she was
unable to live in her apartment or enjoy the amenities of
being a tenant at Canyon Place/Rock Creek apartments because
of the continual threats and harassment from the Nobles and
the failure of the apartment complex management or the St.
George Police Department to address the problem(s), Ms. Phibbs
pays rent.

133.  Ms. Schimbeck hides in the back office when Mr. Phibbs enters
to pay the rent; and Ms. Phibbs heard her say to a Ms. Headman, see
if she says anything about the assault;  by Ms. Schimbecks' hiding

-25-

in the back room; she was refusing to address the problems Ms.
Phibbs and her minor daughter were having in being unable to
access their apartment for fear of being assaulted again by the
Nobles, or refuse to deal with the fact that personal items as
well as household items were missing from their apartment; these
missing items are separate from the August 14, 1999 incident.

134.  At the time Ms. Phibbs left from paying the rent; she drove
to her apartment to grab a couple of items, and the Nobles drove up,
and N. Nobles made like a lunge for Ms. Phibbs, but S. Nobles grabs
her saying don't.

135.  In response Ms. Phibbs jumps in her vehicle, and S. Nobles
yells at her; you better run, and it was during this stop and grab
at the apt. that she saw an old notice affixed to the door of her
apt. that gave notice her apt. was to be entered for inspection.

136.  During the time frame following the assault, Ms. Phibbs and
her minor daughter are living out of a suite case; they are unable
to live in the apt. for fear of their lives, though required to
pay rent, or forfeit all thier belongings that were in the apartment.

137.  Not only during the period leading up to Ms. Phibbs and her
minor daughter being assaulted, but from the time of moving in to
the complex, and the harassment and threats on their lives by the
McMurrays, and then later by the nobles; Ms. Phibbs began to develope
a sleep disorder, and her daughter's hair began to fall out; and they
both were seeing various doctors and a psychologist in attempting to
cope with the ever increasing problems, stress, and their fears, in
attempting to secure reasonable accommodations for her self and her
minor daughter.

138.   All through August and September Ms. Phibbs and her minor daughter continue to see these doctors and therapist.

139.   August 17, 1999.  Ms. Phibbs' daughter's hair is continuing to fall out; her face is to swollen for the dentist to take out her braces so that an MIR scan can be done and her cracked ribs have not healed from the assault; and she is continuing with the psychologist.

140.   Ms. Phibbs nurological problem has caused a curvature of her neck, and the assault with the blows to her head and face have aggravated this condition and the pain she suffers; additional X-rays were taken, August 20, 1999, and recently an MIR scan was taken.

141.   September 12th, Ms. Phibbs returned to the apartment; her parking is occupied by Nobles' friends; they refuse to move their vehicle; Ms. Phibbs calls C.H. Towing.

142.   C.H. Towing in attempting to tow the vehicle is informed by the apartment management that it is public parking for use by any one.

143.   September 13, 1999.  Ms. Phibbs is again seen by Dr. Welsh to see how her surgery is healing after the assault, which reopened the wound.

144.   September 21, 1999.  A church member from Ms. Phibbs' Ward (Mr. Jones) accompanies her to the apartment to get some personal items; Ms. Phibbs is in fear for her life and that of her minor daughter, and she talked with the Bishop of her church who arranged for a church member to accompany her when she went to her apartment; and when she moved church members helped with the move.

145.   October 7, 1999.  Ms. Phibbs' daughter is seen again by
Dr. Motoki a reconstructive surgeon concerning her jaw; assault
had aggravated a fracture to the hinge of her jaw that she had
suffered in a snow sledding accident some years prior.

146.   October 1, 1999.  Ms. Phibbs when she was at the apartment;
the Nobles had blocked her car in with a moving van and trailer,
and when she tried to leave; S. Nobles came out of their
apartment and starts towards Ms. Phibbs saying now I can work
this over; Ms. Phibbs calls to r̃s. Palmer not to leave; and S.
Nobles then moves the van so Ms. Phibbs can leave the apartment
complex;

147.   September 7, 1999.  The St. George, Utah District Court
issued a no contact order against N. Nobles; the order was issued
to prevent retaliatory acts against Ms. Phibbs from N. Nobles.

148.   During September 1999 after members of her Church had loaded
the moving van and left, and it appeared that Ms. Phibbs was alone,
S. Nobles, who along with N. Nobles had been watching Ms. Phibbs
during the loading of the van came out of their apartment and
headed directly toward Ms. Phibbs; and then when he discovered
Ms. Phibbs was not alone; he turned and went back to their
apartment; again Sal from Ms. Phibbs' Ward stayed to assure her safety.

149.   On October 28, 1999 Ms. Phibbs was subpoenaed to testify
against N. Nobles in the local district court in St. George,
Utah; N. Nobles was found guilty of disorderly conduct and
sentenced in absentia.

150.   From the time Ms. Phibbs filled a complaint with the Utah
Antidiscrimination and Labor Division  [UFHA - HUD] against
American Property  Management;  she and her
minor daughter were constantly receiving hang-up calls.
151.   Ms. Phibbs complained to the Utah Fair Housing Authority in
Salt Lake City, Utah about these calls and they stopped; however,
Ms. Phibbs via caller I.D. did get, just prior to the cessation of
the hang-up calls, a name:  A. Gibson.

        The herein before designated Statement Of The Case located
at subsection F. pp. 4 to 29 paragraphs 1 through 151 is hereby in
its entirety fully incorporated and adopted in support of each and
every separate Claim(s) set forth at subsection G. pp. 30 through
33 paragraphs 1  through 13 as if specifically and individually
cited in support of each and every claim.


//

//

//

//

//

//

//

//

//

G.                          CLAIMS

1.    American Properties Management Through Advertising
      Handicapped Parking In A Brochure Intentionally
      And/Or Recklessly Induced And Caused Plaintiff
      Ms. Phibbs A Handicapped Person Within The Meaning
      Of The Americans With Disabilities Act And  The
      Fair Housing Administrative Act, And Her Minor
      Daughter To Sojurn To St. George, Utah And Lease
      An Apartment At Canyon Place/Rock Creek Apartment
      Complex; Where Ms. Phibbs And Her Minor Daughter
      Were Continually Harassed And Threatened By Tenants
      With Bodily Harm; Then Subsequently Assaulted; In
      Violation Of Plaintiffs' Rights, Privileges And
      Immunities Secured Under The Fourteenth Amendment
      To The United States Constitution; And Article 1
      Sections 7, 24, And 25 Of The Utah Constitution.

2.    The Acts Of Defendants Nellie Nobles And Sam Nobles
      Against Plaintiffs Ms. Phibbs And Her Minor Daughter
      Including Both Their Threats To Do Harm; And The
      Ensuing Assault Of Plaintiffs Was Overtly And/Or
      Covertly Significantly Encouraged By The Indivdual
      And Combined Acts And Inactions Of Defendants
      American Properties Management, Tatum, Schimbeck,
      Dalton   and Gibson, Contrary To The Guarantees
      Afforded To Plaintiffs  Under The Fifth And Fourteenth
      Amendments To The United States Constitution, And
      Article 1 Sections 7, 24, And 25 Of The Utah Const.

3.    Defendants By Their Acts And Inactions Both Individually
      And In Concert With One Another Intentionally Caused
      And Inflicted Upon Ms. Phibbs, A Handicapped Person
      Within The Meaning Of The ADA and FHA Acts, And Her
      Minor Daughter Extreme Emotional Distress, Pain, And
      Fear; In Violation Of The Rights, Privileges, And
      Immunities Guaranteed To Plaintiffs Under The Fourth,
      Fifth, And Fourteenth Amendments To The United States
      Constitution; And In Violation Of Article 1 Sections
      7, 24, And 25 Of The Utah Constitution.

4.    Defendants, American Properties Management, Tatum,
      Schimbeck, Dalton, And Gibson Had Actual And/Or
      Constructive Knowledge That Defendants N. Nobles And
      S. Nobles Conspired With One Another And Others Within
      The Meaning of 42 USC Section 1985(3) To Physically
      Assault Ms. Phibbs, A Handicapped Person, And Her
      Minor Daughter; Intenionally And Invidiously
      Discriminating Against Them By Failing And/Or By

5.   Refusing To Prevent The Violation Of Their Civil Rights
     By Defendants N. Nobles And S. Nobles; And/Or One
     Another And Others, In Violation Of The Rights, Privileges,
     And Immunities Guaranteed To Ms. Phibbs And Her Minor
     Daughter Under The Fourth, Fifth, And Fourteenth Amendments
     To The United States Constitution; And Article 1 Sections
     7, 24, And  25 Of The Utah Constitution.

6.   Plaintiffs Ms. Phibbs A Handicapped Person And Her Minor
     Daughter Were Treated In a Deliberately Different Manner By
     Defendants American Properties Management, Tatum, Schimbeck,
     Dalton, And Gibson Than Similarly Situated Tenants; And As
     Such Were Discriminated  Against And Denied Equal Treatment
     Guaranteed To Them   Under  The Equal Protection Clause Of
     The Fourteenth Amendment To The United States Constitution;
     And Articel 1 Sections 7, 24, and 25 Of The Utah Constitution.

7.   Plaintifffs' Claim That Defendants American Properties
     Management Acted Knowingly, Recklessly, Or With Deliberate
     Indifference Toward; And In Callous Disregard For The Rights
     Of Ms. Phibbs A Handicapped Person Within The Meaning Of The
     ADA And The FHA Acts, And Her Minor Daughter; In Failing To
     Instruct, Train, And Supervise Their On Sight Manager And
     Assistant Managers Schimbeck And Dalton, And Their Agent
     Tatum, In Their Duties And Obligations Under The Laws And
     Constitution Of The State Of Utah And The Federal Constitution;
     And Under The ADA And FHA Acts; So As To Refrain From
     Depriving, Or Allowing To Be Deprived Ms. Phibbs And Her
     Minor Daughter Of Their Constitutional And Statutory Rights,
     Privileges, And Immunities Secured To Them Under Both The
     Fourth, Fifth, And Fourteenth Amendments  To The United States
     Constitution; And Article 1 Sections 7, 24, And 25 Of The
     Utah Constitution.

8.   Plaintiffs Ms. Phibbs And Her Minor Daughter Due To The Acts
     And Inactions Of Defendants American Properties Management,
     Tatum; Schimbeck, And Dalton; Caused Plaintiffs To Be
     Harassed, Threatened, And Finally Assaulted By Tenants; By
     Not Providing handicap Parking  Pursuant To The Provisions Of
     The ADA And The FHA Acts; And By Instructing Ms. Phibbs And
     Her Minor Daughter To Go From Apartment To Apartment To
     Determine Whose Vehicles Occupied  Their Parking Slot; And
     To Take Pictures Of These Vehicles; And/Or Write Down The
     License Plate Numbers, Where This Action On The Part Of
     Plaintiffs; Intentionally Instigated By Defendants American
     Properties Management; Tatum, Schimbeck; And Dalton; Caused
     Various Tenants To Become Not Only Verbally Assaultive Toward
     Plaintiffs; But Initiating Threatening Conduct; That
     Culminated In Ms. Phibbs And Minor Daughter Being Assaulted,
     In Violation Of The Rights, Privileges, And Immunities
     Afforded To Plaintiffs Under The Provisions Of The Fourth,
     Fifth, And Fourteenth Amendments To The United States
     Constitution; And Article 1 §§§ 7,24,And 25 Utah Constitution.

9.     The Acts Of Defendants N. Nobles And S. Nobles Against
       Plaintiffs Ms. Phibbs And Her Minor Daughter Including
       Both their Threats To Do Harm, And The Ensuing Assualt
       Of Plaintiffs Was Overtly And/Or Covertly Significantly
       Encouraged By The Individual And Combined Acts And
       Inactions Of Defendants American Properties Management;
       Tatum; Schimbeck; Dalton; And Gibson; In Violation Of
       Plaintiffs Rights, Privileges, And Immunities Guaranteed
       To Them Under The Provisions Of The Fourth, Fifth, And
       Fourteenth Amendments To The United States Constitution;
       And Article 1, Sections 7, 24, And 25 Of The Utah
       Constitution.

10.    Plaintiffs Ms.  Phibbs A Handicapped Person within the
       Meaning Of The ADA And The FHA Acts, And Her Minor
       Daughter Had A Substantive Right(s) To Be Secure In
       Their Persons And Affects That Were Enjoyed By Similarly
       Situated Tenants At Canyon Place/Rock Creek Apartments;
       And, Defendants' Deprivation Of That Protected Right(s)
       Was Intentional, Discriminatory And Capricious, And
       Violated Plaintiffs' Rights, Privileges, And Immunities
       Protected Under the Fourth, Fifth, And Fourteenth
       Amendment To The United States Constitution; And Article
       1 Sections 7, 24, And 25 Of The Utah Constitution.

11.    Plaintiffs Ms. Phibbs And Her Minor Daughter, Were
       Intentionally And Purposefully Discriminated Against By
       Defendants; Intended Disparate Treatment Of Ms. Phibbs
       A Handicapped Tenant Within The Meaning Of The Americans
       With Disabilities Act And the Fair Housing Administration
       Act, And Her minor Daughter; Where Plaintiffs Were Entitled
       To Protection From Said Invidiously Discriminatory Acts; In
       Violation Of The Rights, Privileges, And Immunites
       Guaranteed To Plaintiffs Under the Fourth, Fifth, And
       Fourteenth Amendments To The United States Consitution; And
       Article 1 Sections 7, 24, And 25 Of The Utah Constitution.

12.    Acting Under Color Of Law, Defendant David Gibson A St.
       George Police Officer, Denied to Plaintiffs Ms. Phibbs And
       Her Minor Daughter The Equal Protection Of The Law(s)
       Through And By His Deliberate Indifference To The Substantial
       Risks And Harms That Ms. Phibbs And Her Minor Daughter Faced,
       Given The Threats By And Aggressive Acts Of Defendants N.
       Nobles And S. Nobles Toward Plaintiffs; And The Inactions Of
       American Properties Management, Tatum, Schimbeck, And Dalton;
       That Resulted In Plaintiffs Being Physically Assaulted By
       Defendant N. Nobles And Assisted By Defendant S. Nobles;
       Where Defendant Gibson Had Personal And Prior Knowledge
       Concerning The Threats And Aggressive Actions Of Both
       Defendants N. Nobles and S. Nobles Toward Ms. Phibbs And Her
       Minor Daughter; In Violation Of Plaintiffs' Rights, Privileges,
       And Immunities Protected Under The Fourth, Fifth, And

Fourteenth Amendment To The United States Constitution; And Article 1 Sections 7, 24, And 25 Of The Utah Constitution.

13. American Properties Management, Tatum, Schimbeck, Dalton, And Gibson Had Actual Or Constructive Knowledge Of Defendants' N. Nobles And S. Noble Conspiracy To Violate The Civil Rights Of Plaintiffs Ms. Phibbs And Her Minor Daughter; And They Deliberately And Purposefully Failed To Take Steps To Prevent, Not Only The Verbal Harassment Of Plaintiffs; But, The Actual Physical Assault Of Plaintiffs, In Violation Of Their Rights, Privileges, And Imunities Guaranteed To Plaintiffs Under The Fourth, And Fifth, And Fourteenth Amendments To The United States Constitution; And Article 1 Sections 7, 24, And 25 Of The Utah Constitution.

H.                        **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs Machell Phibbs and her minor daughter, Nicolina Phibbs pray  that they recover from these defendants as follows:

A.  For the intentional and deliberate infliction of extreme emotion pain, distress, and physical injury and suffering on Plaintiffs Machell Phibbs and Nicolina Phibbs by defendants; American Property Management, Tatum, Schimbeck, Dalton, Gibson, N. Nobles, and S. Nobles; both in their professional capacities, and in their personal capacities in the amount of $250,000 for each Plaintiff from each and every defendant.

B.  For the intentional and purposeful failure of American Property Management to provide handicapped parking at Canyon Place/ Rock Creek Apartment Complex when American Property Management so advertised in its brochure handicapped parking, that led to the harassment and assault on Plaintiffs Machell Phibbs and her minor daughter, Nicolina Phibbs by defendants N. Nobles and S. Nobles the  amount of $250,000 for each Plaintiff.

C.  For the intentional and purposeful discrimnatory treatment of Plaintiffs Machell Phibbs and her minor daughter, Nicolina Phibbs by defendants American Property Management, Tatum, Schimbeck, Dalton, and Gibson the amount of $100,000 to $150,000 for each Plaintiff.

D.  For the invidiously selective treatment of Plaintiffs Machell Phibbs a handicapped person within the meaning of the ADA and FHA acts, and her minor daughter, Nicolina Phibbs by defendants American Property Management, Tatum, Schimbeck, Dalton, and Gibson the amount of between $100,000 to $150,000 for each Plaintiff from each defendant.

E.  For the conspiracy to violate the rights, privileges, and immunities of Plaintiffs Machell Phibbs, a handicapped person within the meaning of ADA and the FHA acts, and her minor daughter, Nicolina Phibbs by defendants American Property Management, Tatum, Schimbeck, Dalton, Gibson, N. Nobles, and S. Nobles the amount of $100,000 to $150,000 from each defendant for each Plaintiff.

F.  For the failure of American Property Management to properly train and supervise their on sight management, Schimbeck and Dalton; so as to prevent their arbitrary and intended discriminatory treatment of Plaintiffs Machell Phibbs, a handicapped person within the meaning of the ADA and the FHA acts, and her minor daughter, Nicolina Phibbs the amount of $25,000 to $50,000 for each Plaintiff.

G.  For the harassment and assault on Plaintiffs by N. Nobles and S. Nobles the amount of $50,000 for each Plaintiff.

H.  For the past, current, and future cost incurred with obtaining, and including any medical treatment an amount not to

-34-

exceed $500,000 for Plaintiff Machell Phibbs and $500,000 for

Plaintiff Nicolina Phibbs.

I.   For the costs incurred by Plaintiffs during the time that

they were unable to reside in apartment F-203 starting with, but

not limited to August 14, 1999; and the cost of lost personal items,

clothing, food, general expenses and specific expenses, as well as

rent during this period including deposit and rent due at the time

of the move into apartment F-203; and cost of moving and relocation

in the amount from $2,500 to $5,000.

J.   For punitive damages as allowed by law.

K.   For the cost of this litigation inlcuding any interests

L.   Plaintiffs requests an award of costs and attorney fees

pursuant to 42 USC § 1988.

M.   Plaintiffs request that the Court grant any other such

releif as the Court may deem appropriate and just.

Signed under penalty of perjury.

Dated: March 28, 2002

Respectfully Submitted:

*Machell Phibbs*
Machell Phibbs
520 South 175 East
Ivins, Utah  84738
Ph. No. 435 629-8626

*Nicolina Phibbs*
Nicolina Phibbs
520 South 175 East
Ivins, Utah 84738
Ph. No. 435 628-8626